Dye, J.
(dissenting). The sole and only issue presented is one of administrative power. It arises from an attempted exercise of jurisdiction by the State Commission for Human Rights, (hereinafter “ Commission ”) over the Board of Higher Education (hereinafter “ Board ”) in respect to enforcement of the statutes against discrimination in employment and promotion of teaching personnel at Queens College. The Board, by this proceeding, has sought to prevent it by asserting its exclusive control over all educational matters, including the right to deal with civil rights complaints within its area of administrative supervision and control. Both courts below have sustained the Board — and properly so. A majority thinks otherwise and is about to dismiss the petition. We cannot agree.
The Commission, Ave respectfully submit, has no power whatsoever to act administratively in the field of education and we regret that the court is about to give it such power under the guise of judicial interpretation. Concededly, both the Board and the Commission are State agencies. Such administrative power *154 as either respectively possesses can only be conferred by the Legislature (N. Y. Const., art. Ill, § 1; Matter of Fink v. Cole, 302 N. Y. 216).
Perhaps it should be said at the outset that no one doubts for a moment that, as matter of State policy, “No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights” (N. Y. Const., art. I, § 11 [approved Nov. 8, 1938]), and that no issue is now presented as to whether any members of the Catholic faith are being subjected to discrimination in employment and promotion as members of the faculty at Queens College.
The Board of Higher Education of the City of New York is a separate and distinct body corporate created by the Legislature having the “ duties and powers of trustees of colleges ” and mandated ‘ ‘ to govern and administer that part of the public school system within the city which is of collegiate grade ”, with authority to “establish * * * faculties ”, “appoint * * * teachers ” and “ fix salaries ” (N. Y. Const., art. XI; Education Law, art. 125, §§ 6201-6202).[1] As such, it is a constituent part of the State educational system (Matter of Wasmund v. La Guardia, 287 N. Y. 417; Nelson v. Board of Higher Educ., 263 App. Div. 144) and is subject to the general supervision of its chief executive officer, the Commissioner of Education (Matter of Board of Higher Educ. v. Cole, 64 N. Y. St. Dept. Rep. 14, 176 Misc. 297, affd. 263 App. Div. 777, affd. 288 N. Y. 607). The State Education Department is headed by the Board of Regents of the State University, who appoint the Commissioner of Education (N. Y. Const., art. Y, §§ 2, 4; art. XI, § 2). The Regents have the power and duty to “ exercise legislative functions concerning the educational system of the state, determine its educational policies, and, except, as to the judicial functions of the commissioner of education, establish rules for the carrying into effect the laws and policies of the state, relating to education ” (Education Law, § 207). For his *155 part, the Commissioner of Education is charged with the general management and supervision of all public schools and all educational work of the State (Education Law, § 101). Among the Commissioner’s specifically named functions is “to cause to be instituted such proceedings or processes as may be necessary to properly enforce and give effect to any provision in this chapter or in any other general or special law pertaining to the school system of the state or any part thereof or to any school district or city” (Education Law, § 308; emphasis supplied), a duty which embraces the enforcement of the provisions of the Civil Bights Law, which prohibit discrimination based on race, creed, color or national origin in places of accommodation in certain named educational institutions not here involved and “ all educational institutions under the supervision of the regents of the state of New York ” (Civil Bights Law, § 40), and not only is the Commissioner, but also any school official or employee, prohibited from inquiring into, indicating or transmitting orally or in writing the religion or religious application of any person seeking employment or official position in the schools of the State of New York (Civil Bights Law, § 40-a), nor may any qualified student ‘ ‘ be refused admission into or be excluded from any public school * * * on account of ” bias (Education Law, §§ 313, 3201), and, if the multiplicity of statutory mandates prove ineffective, there are always at hand the criminal sanctions of the Penal Law (§§ 514, 700). His decisions are “ final and conclusive, and not subject to question or review ” (§ 310) unless the decisions are “ purely arbitrary ” as found by the court (Matter of Board of Higher Educ. v. Allen, 6 N Y 2d 127). Thus it is that the Regents and the Commissioner have full power to enforce all provisions against discrimination both in employment and the use of facilities throughout the State school system inclusive of this petitioner.
Nothing in article 15 of the Executive Law (L. 1945, ch. 118) supersedes, limits or repeals the administrative and judicial powers theretofore conferred on the Regents and the Commissioner. The fact of the matter is that when the Temporary Commission against Discrimination completed its investigation and made its report with recommendations to the Legislature, it stated, among other things, “ The Board of Regents and the Department of Education are unique in that they possess *156 administrative, executive, legislative and judicial power over ‘ all of the educational work of this state ’ ” (Education Law, § 101) and gave as its considered conclusion “ that the school authorities do not need more law either to suppress discrimination in the school system itself or to set up educational policies and programs against those prejudices which produce discrimination and its disastrous consequences.” (Report, Temporary Commission against Discrimination, N. Y. Legis. Doc., 1945, No. 6, pp. 42-47.)
With this in mind, the Temporary Commission took pains to exclude from its definition of the term ‘[1] employer ” “ an educational * * * association * * * corporation * * * not organized for private profit” (Executive Law, § 292, subd. 5). This definition has survived intact numerous amendments to the 1945 Act. Subdivision 9 of section 292 (added by L. 1952, ch. 285) does not change the previously authorized employer exemptions. It was an entirely new subdivision of the section defining the term “ place of public accommodation, resort or amusement ” and listed by name the type and kind of places included. While this served to enlarge the area over which the Commission was to exercise jurisdiction, the statute by specific language expressly excluded from the jurisdiction over places of public accommodation by naming the various categories of public schools “ supported in whole or in part by public funds ” and “ all educational institutions under the supervision of the regents ” (emphasis supplied). If there was any doubt that the State educational system was excluded from the jurisdiction of the Commission this effectively confirms it. As we have seen, discrimination in places of public accommodation had already been covered (Civil Rights Law, § 40, as amd. by L. 1913, ch. 265).
We note as a matter of interest, although not involved herein, that when section 296 was amended to prohibit discrimination in the employment of persons on account of age (especially over 45 years) by adding the word “age” to the phrase “race, creed, color or national origin” that, at the same session of the Legislature, a new and parallel section was added to the Education Law prohibiting discrimination in the hiring of teachers on account of age (Education Law, § 3027, added by L. 1958, ch. 902), thus recognizing that institutions under the *157 supervision of the Board of Regents were not employees within the jurisdiction of the Commission and that a separate statute was necessary.
Nothing in the history of the statutory enactment remotely suggests that anyone in a position of responsibility considered that the exemption of an educational institution as an excluded employer was limited to private educational organizations. Such a reading can only be accounted for by rewriting the statute in such a manner that the word “ private ” qualifies the educational “ corporation ” and not “ profit ” as presently written. We may not indulge our judicial talents to accomplish any such result. If such a revision is desirable, it should be done by the Legislature. If this definition of an employer were not sufficiently clear to exclude the Board of Higher Education from the coverage of the statute now before us, any doubt on that score would be dispelled by the legislative history which is before us in the report of the Temporary Commission.
At the hearing before a Joint Legislative Committee, Mr. Charles Tuttle, counsel of the Temporary Commission, stated: “ In the field of formal education the commission, according to its report, makes the basic declaration that the Board of Regents and the State Department of Education already constitute a permanent state agency presently clothed by constitution and statute with full administrative, executive, legislative and judicial powers over ‘ all of the educational work of the state ’, and with ample authority to use those powers against bad and for good human relation, and to enforce all laws and adopt new measures against discriminations in the school system on account of race, creed, color or national origin.” And in his affidavit of October 5, 1960 Mr. Tuttle stated that ‘ ‘ The Temporary Legislative Commission which in 1944 drafted and in 1945 recommended to the Legislature the law creating the State Commission Against Discrimination intended to exclude from the jurisdiction of that Commission the non-profit educational institutions under the jurisdiction of the Board of Regents and the State Commissioner of Education, among which institutions was and is the Board of Higher Education of the City of New York.”
The Temporary Commission worded its definition of “employer” now constituting subdivision 5 of section 292 of the Executive Law with such intent in mind and for the purpose *158 of effectuating such exclusion. The Legislature thus was fully advised and aware of the foregoing intent and the foregoing purpose and effect in the wording of the ‘ definition ’ of ‘ employer ’ ’ \
Our State educational system has long enjoyed administrative independence conferred by the framers of the Constitution and legislative enactment. It is well that it should. No field of government is more important or more sensitive than the education of our children. New York has long enjoyed a justly deserved reputation of leadership in this field which obviously could only have been accomplished by the carefully worked out policy of reposing general management and supervision of the public school system in the Regents and the Commissioner of Education. The selection and promotion of teaching personnel is a specialized function which is peculiarly within the field of education. It is surrounded by many safeguards with emphasis on the applicant’s academic qualifications, character and performance. The employment and promotion of persons so accredited are nonetheless subject to constitutional and statutory interdictions against bias, one of which is that the Board may not even inquire into the religious affiliation of an applicant (Civil Rights Law, § 40-a). Both the framers of the Constitution and the State Legislature have made it manifestly clear that the school boards under the Regents and the Commissioner have full authority and all necessary power to deal with alleged discrimination in the educational system. To be sure, the authority and power conferred on the Commission in the field of employment is a broad one, but it does not follow that the Legislature thereby intended to limit, supersede or overlap the authority and powers theretofore conferred upon and possessed by the Board. To say that they so intended creates an administrative conflict that can only lead to confusion and uncertainty in the important area of education. No better illustration of the mischief resulting from such a dual authority can be pointed to than the present situation. When anonymous charges of discrimination against Catholics in the employment and promotion of faculty members at Queens College were made in 1958 the Board took cognizance of the charges by appointing a subcommittee of its membership consisting of six persons of distinguished reputation and equally divided between members *159 of Catholic, Jewish and Protestant faiths to conduct an investigation into the charges. It proceeded to do so by conducting a hearing at which many witnesses were heard and many documents examined. The subcommittee reported as to its conclusion: “We find no pattern of religious discrimination at Queens College, and no instance in which there is any basis for preferring charges of religious discrimination against any person now at Queens College.” The report was adopted by the Board and later in an article 78 proceeding was reviewed and upheld in the courts (Lombardo v. Board of Higher Educ. of City of N. P., 13 N Y 2d 1097). While the Board was thus engaged, sometime in September or October, 1958, it was announced in the public press that the Commission was conducting an informal investigation of charges of alleged discrimination in employment and promotion of faculty at Queens College. The Board promptly expressed to the Commission its opinion that it lacked jurisdiction in the premises but that, as a matter of courtesy, it would furnish the Commission with a transcript of the proceedings had before it, together with supporting documents, the report of its findings and conclusions. Nonetheless, the Commission continued its one-member investigation. Later it was reported in the press that the Commission had found the Board guilty of discrimination.
The evil of such dual exercise of administrative power is all too apparent. The conflicts thus engendered can only serve to disrupt the morale and efficiency of the teaching staffs of our public schools as well as to confuse and alarm members of the public. Jurisdictional rivalries are always fraught with danger. To encourage and approve such rivalry in a sensitive area such as our public school system has potentials of the gravest consequences.
So much of the order of the Appellate Division as modified the order of Special Term should be reversed and, as so modified, otherwise affirmed.
Chief Judge Desmond and Judges Burke and Scileppi concur with Judge Bergan ; Judge Dye dissents in an opinion in which Judges Fuld and Van Voorhis concur.
Ordered accordingly.